1

2

3

4

5

6          UNITED STATES DISTRICT COURT

7          NORTHERN DISTRICT OF CALIFORNIA

8

9

DAMIEN HALL,

10

                Petitioner,                        No. C 09-5299 PJH

11

        v.

12                                                 **ORDER GRANTING PETITION
                                                   FOR WRIT OF HABEAS CORPUS**

13   VINCENT CULLEN, Acting Warden
     of San Quentin State Prison,

14

                Respondent.

15   _____/

16          Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. §

17   2254, filed by state prisoner, Damien Hall ("Hall").  Having reviewed the parties' papers,

18   and having carefully considered their arguments, the record, and the relevant legal

19   authorities, the court hereby GRANTS the petition.

20                                 **BACKGROUND**

21   **A.    Procedural Background**

22          Hall, who is represented by counsel, filed his federal habeas petition on November

23   6, 2009.  At the time he filed his petition, Hall was out of custody on bail.  However, he was

24   subsequently remanded into state custody.

25          Hall was charged with forcible penetration of the genital opening of a person by a

26   foreign object pursuant to California Penal Code § 289(a)(1) and with sexual battery under

27   California Penal Code § 243.4(a).  On December 14, 2006, a jury in the San Francisco

28   County Superior Court convicted Hall of the lesser-included offense of assault with intent to

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  commit forcible sexual penetration in violation of California Penal Code § 220.[1]  On

2  September 19, 2007, the trial court sentenced him to two years in prison.  Hall appealed,

3  and the California Court of Appeal affirmed on June 16, 2009, and the California Supreme

4  Court denied review on September 30, 2009.

5         On January 27, 2010, Hall filed a motion for release pending decision on his federal

6  habeas petition, which this court denied on March 8, 2010.  Hall's petition was fully briefed

7  on April 29, 2010, and in accordance with the March 8, 2010 order, the court has expedited

8  its review of Hall's petition.

9         **B.    Factual Background**

10        The charges against Hall stem from an incident that occurred downtown San

11 Francisco on New Year's Eve, December 31, 2005.

12        Hall was out that evening in San Francisco's Union Square area with his childhood

13 friend and codefendant Tomelia Dillon.  Hall, who lived in Suisun City, California, at the

14 time with his wife and two children, drove into the city with Dillon.  They drove to the

15 Tenderloin neighborhood, where they bought and drank some liquor, met another person

16 known to Hall as "Mr. Chill," and began walking up toward the Union Square area.  Hall

17 testified at trial that once they arrived at the cable car turnaround near Powell and Market

18 Streets, they headed toward the Embarcadero, during which time they heard chimes

19 signifying that it was midnight.  After reaching the Embarcadero, they headed back up

20 Market Street toward Union Square.

21        Hall testified that Dillon was behaving in a very "abrupt" and "forward" manner with

22 people they encountered along the way, and that Hall felt like he had to apologize for

23 Dillon's behavior.  Hall testified that he was "buzzed" at the time, but not drunk.

24        Meanwhile, the nineteen year-old victim, Antoinette B., who was 5'1 and weighed

25

26        _____

          [1]Hall was tried jointly with codefendant, Tomelia Dillon, who was charged with robbery
27 in the second degree under California Penal Code § 212.5(c); assault by means of force likely
   to produce great bodily injury under California Penal Code § 245(a)(1), and with misdemeanor
28 battery under California Penal Code § 242.

United States District Court

For the Northern District of California

1   ninety pounds, had come into San Francisco with six other friends from San Ramon,

2   California to celebrate New Year's Eve.  Antoinette and her friends traveled to San

3   Francisco on BART around 9:30 or 10:00 p.m. on December 31, 2005.  They checked into

4   the Galleria hotel and then went out to look around.  Antoinette testified that she had only

5   been in San Francisco one other time and was not familiar with the Union Square area.

6        Antoinette testified that she and her friends walked around for a couple of hours.

7   They walked through a restaurant, but did not eat.  Antoinette lost her cell phone while

8   walking around.  The group brought in the new year near Macy's department store in Union

9   Square, and then returned to their hotel.  Antoinette's friends subsequently went to a

10  restaurant in the Galleria for drinks, but she stayed outside to smoke a cigarette.  She

11  borrowed a cell phone from one of her friends, and spoke with another friend of hers,

12  Albert, who was also in San Francisco with a separate group of friends.  She and Albert

13  agreed to meet up, but when Antoinette attempted to get directions to her hotel from her

14  friends to give to Albert, there was too much noise.  Albert told her he was near a clock

15  tower, and Antoinette began walking in a direction that she thought would lead her to

16  Albert.  Meanwhile, it was Antoinette's understanding that Albert and his friends would be

17  walking toward her.

18        As she was walking toward what she believed was Albert's location, she

19  encountered several police officers near a 7-Eleven store.  She asked for directions, but

20  was still unclear afterward where she was going.  She arrived at a BART station, but then

21  decided she should return to her hotel when she did not find Albert.  She asked people she

22  ran into on the street for directions to the Galleria, but received conflicting instructions so

23  she walked in a direction that she believed would lead to the hotel.

24        Around that time, Antoinette encountered Hall, Dillon, and Mr. Chill.  What transpired

25  during that encounter is in dispute.

26        Hall testified that he and the two other men first encountered Antoinette standing by

27  herself holding a champagne glass at the corner of Sutter and Market streets.  Dillon and

28

United States District Court

For the Northern District of California

1    Mr. Chill began talking to her, and Hall joined them in conversation.  Hall testified that

2    Antoinette was "bubbly" and "nice."  He asserted that they were flirting with each other, and

3    that Antoinette turned around and "backed over" into him.  According to Hall, he put his

4    right arm, and then his left arm around her abdomen area.  Antoinette then grabbed Hall's

5    hand and began to rub it on her belly.  Hall moved his left hand down her pants.

6         Hall testified that as he began to slide his hand down the front of Antoinette's pants,

7    she told him to stop.  He stated that he stopped immediately, took his hand out of her

8    pants, and backed away.  He asserted that prior to her telling him to stop, he had gotten his

9    hand underneath her pant line only to his knuckles, and that he had not unbuttoned or

10   unzipped her pants.  He stated that when he backed away from her, Antoinette laughed,

11   and Hall responded "okay, whatever."  Antoinette then turned away from Hall and crossed

12   the street.  Hall admitted that he intended to stick a finger in Antoinette's vagina "if it ever

13   got that far."

14        Antoinette testified that Hall and his two friends approached her as she was walking

15   back to her hotel and offered her directions.  She did not remember asking them for

16   directions first, though.  Dillon spoke to her first, and one of the men told her that she was

17   headed in the right direction.  She subsequently sensed that the men were following her,

18   and she was nervous and scared of the men.  She did not encourage them to talk to her or

19   walk with her, but they did anyway.  She crossed the street to get away from the men, but

20   they followed her.

21        Shortly after she crossed the street, the three men surrounded her.  Dillon was on

22   her left side, and Hall, who was initially on her right side, ended up behind her.  Antoinette

23   stated that she was carrying her purse on one of her shoulders and was holding her friend's

24   cell phone.  She was on the phone with her friend, Albert, asking him to come help her

25   because she was being followed, when Dillon grabbed the phone out of her hand.  She

26   never saw the phone again.

27        According to Antoinette, Hall subsequently reached around her from behind and

28

                                               4

United States District Court

For the Northern District of California

1    pinned her arms to her sides.  She tried to get away from Hall but could not.  She testified

2    that Hall then, against her will, put one of his hands into her shirt on her left breast under

3    her bra.  He then slid his hand down her jeans, unbuttoned them and pulled down the

4    zipper.  He stuck his hand down her pants below her underwear.  Initially, she testified that

5    she believed that the tip of Hall's finger penetrated the outside of her vagina for a few

6    seconds, but that it never fully entered her.  In later testimony, she stated that the tip of his

7    middle finger touched the outside of her vagina but did not penetrate it.

8        Antoinette did not want Hall to touch her, and she told him to stop.  She started

9    crying and screaming for Hall to let her go and for help, but no one came to her aid.  After a

10   few seconds, Hall withdrew his hand and let her go.  She asked the men why they would do

11   that to her, and did not remember getting any response.

12       Antoinette testified that she then zipped up and buttoned her pants as she walked

13   back across the street to an area with more people.  The men, however, continued to follow

14   her.  She was still crying and asking people on the street for help.  Dillon apparently caught

15   up with her and told her to stop asking for help, and shoved her when she asked for help

16   again.  At a corner near another hotel, the Grand Hyatt, Antoinette asked a woman for

17   directions, and Dillon responded by kicking her on her upper right thigh.  Dillon ordered her

18   to stop asking for help and told Antoinette she was going to make him some money.

19       A couple seconds later, Dillon grabbed Antoinette's purse.  At that point, Antoinette

20   testified that she was scared for her life and made a break for the Hyatt's entrance.  As she

21   reached the Hyatt's revolving doors, Dillon came up behind her, grabbed her by the hair,

22   and pulled her back so that her legs and feet were dragging on the sidewalk.  A Hyatt

23   security guard approached and Dillon ran off.[2]

24       A Hyatt security guard testified that he was checking identification to confirm that

25   those entering the hotel were guests around 1:00 a.m. on January 1, 2006, and was

26   _____

27       [2]By stipulation, the jury was shown a Hyatt security camera videotape taken at 1:11
     a.m. on January 1, 2006.  The videotape showed Dillon following Antoinette and pulling her

28   hair with one hand, while holding her purse in his other hand.

United States District Court

For the Northern District of California

1   stationed approximately ten feet from the hotel doors on Stockton street.  He heard a loud

2   bang and a female screaming, and noticed people in the lobby looking toward the glass

3   hotel doors.  He looked out and saw a female being dragged on the sidewalk by her hair in

4   the direction of Sutter Street by an African-American male who was over six feet tall and

5   appeared to weigh more than 200 pounds.  The guard ran out of the hotel toward the

6   female, and the man ran away.  The guard then picked up the female and carried her inside

7   the hotel.

8        Two off-duty police officers, Alameda County Sheriff's deputies, Curtis Nelson and

9   Shawn Christiansen, and their wives also witnessed the altercation between Dillon and

10  Antoinette.  The officers were sitting with their wives in the Hyatt's lobby when they heard a

11  loud noise and something hit the window outside the entrance to the hotel, followed by the

12  sounds of a woman screaming.  The officers ran outside and observed Antoinette on the

13  ground with a group of people surrounding her, and the Hyatt security officer attempting to

14  comfort her.  Nelson asked Antoinette what happened, and she gave him a description of

15  Dillon.

16       Nelson then ran to the corner and looked up Sutter Street for the suspect.  He

17  spotted Dillon, who matched Antoinette's description.  Nelson ran up to Dillon, identified

18  himself as an Alameda County law enforcement officer, and advised Dillon that he had

19  reasonable cause to believe that he had been involved in an incident in front of the Hyatt

20  and that Dillon needed to return with him to sort things out.  Dillon pulled out Antoinette's

21  purse from underneath his shirt, gave it to Nelson, and stated, "you got me."  As Nelson

22  and Dillon returned to the hotel, Dillon pulled out of Nelson's grasp and sprinted up Sutter

23  Street.  As Nelson chased Dillon, Hall who was nearby, but whom Nelson failed to observe,

24  lowered his shoulder into Nelson and knocked Nelson into the side of a building.  Deputy

25  Christiansen observed this, and then joined Nelson in chasing Dillon.  They caught Dillon

26  after he tripped.  San Francisco Police Department officers detained Hall nearby.

27       Antoinette then identified both Hall and Dillon, along with her purse.

28

United States District Court

For the Northern District of California

1    Antoinette testified at trial that she was slightly intoxicated and "buzzed," but not to

2  the point that she was unaware of what was going on.  However, Dr. Nikolas Lemos, the

3  forensic laboratory director and chief forensic toxicologist for the City and County of San

4  Francisco, testified that based on blood and urine samples taken that night, Antoinette had

5  a blood alcohol content ("BAC") level of 0.17 percent at approximately 1:30 a.m.  Lemos

6  opined that Antoinette had to have consumed approximately eight and one-half to nine

7  drinks that evening, and that she was intoxicated at the time she encountered Hall.  He

8  further testified that the average person with Antoinette's BAC level would experience

9  depressed inhibitions and would possess an impaired ability to process stimuli, to

10  understand and respond to what is going on around her, and to judge and recall a situation.

11

12    Dr. Lemos also testified that Antoinette had cannabis and cocaine in her system at

13  the time of the incident.  Dr. Lemos opined, contrary to Antoinette's testimony otherwise,

14  that she must have taken an "undetermined amount of cocaine" in the "time frame of her

15  encounters with Dillon and Hall."

16    Hall called several witnesses at trial who testified to his reputation for truthfulness

17  and good character.  The witnesses included two people who had served as mentors to

18  Hall, one of whom had known Hall for seventeen years and testified that Hall was

19  "incredibly honest" and never appeared aggressive toward women.  The other two

20  witnesses' testimony regarding Hall was similar.

21    The jury returned verdicts finding Hall not guilty of forcible sexual penetration with a

22  foreign object and not guilty of the lesser-included offense of attempted sexual penetration

23  with a foreign object.  Clerks Transcripts ("C.T.") 355, 357.  It also found him not guilty of

24  sexual battery. C.T. 358. The jury, however, found him guilty of the lesser-included offense

25  of assault with intent to commit penetration of the genital opening of another person by a

26  foreign object.  C.T. 356. The jury found Dillon not guilty of second degree robbery, but

27  convicted him of the lesser-included offense of grand theft from the person, and also of

28

7

United States District Court

For the Northern District of California

1   assault by means likely to cause great bodily injury and misdemeanor battery.

2        Following the jury verdict, Hall moved for a new trial, arguing that the jury

3   instructions were defective.  In support of his motion, Hall submitted three declarations from

4   jurors William Sealy, Stephanie Orr, and Duane Pellervo, which suggested that it was a

5   defect and/or omission in the instructions that led the jury to return a guilty verdict.  Two of

6   the three jurors who submitted declarations asserted that the jury "verbally discussed and

7   agreed" that "the prosecution did not prove that Hall did *not* reasonably believe that

8   Antoinette B. consented to his touching of her."  Those two jurors also attested that the jury

9   "verbally discussed and agreed" that Hall was not guilty of the charged offenses based on

10  the defense of a reasonable belief in consent.  All three jurors attested that they "verbally

11  discussed and agreed" that such a defense was not available for the offense for which they

12  convicted Hall, per the court's instruction pursuant to CALCRIM No. 890.  Two of the three

13  declarations then provide that the jury "verbally discussed and agreed" that if such a

14  defense was available with respect to the lesser-included offense of assault with intent to

15  commit forcible sexual penetration under California Penal Code § 220, "a finding of not

16  guilty would be the verdict."  Additionally, all three of the declarations state that the "jury

17  verbally discussed and agreed that the [CALCRIM 890] instruction only referenced the jury

18  instruction of CALCRIM 1045 as to the defendant's intent, not as to defenses."  *Id.*

19       The trial court denied the motion on the record without explanation.  Exh. B-20 at 13.

20  Soon thereafter, Hall filed a renewed motion for a new trial based on an intervening

21  California Court of Appeal decision.  The trial court denied that motion without explanation

22  as well.  Exh. B-21 at 4.

23       One day before the trial court sentenced Hall, juror Pellervo, one of the jurors who

24  submitted a declaration, sent a letter to the trial judge.  That letter was filed and became

25  part of the record on appeal before the state courts and is included in the record before this

26  court.  In his letter, Pellervo, who stated in his declaration that he is a lawyer, asserted that

27  his guilty verdict was based on his "incorrect understanding that a 'reasonable belief'

28

**United States District Court**
For the Northern District of California

defense did not exist" for the lesser-included offense of assault with intent to commit forcible sexual penetration. Pellervo implies that the jury acquitted on the charged offenses because it found that Hall reasonably believed that the victim consented to the physical contact. Pellervo notes that the jury specifically looked through the instructions regarding whether such a defense applied to the lesser-included offense, but failed to locate it. Pellervo expresses dismay at the fact that the trial court denied the motion for a new trial in spite of the juror declarations. He asserts that "while the primary purpose of this letter [sic] is to request that [the court] impose the lightest possible sentence on Mr. Hall as well as release him pending the decision on appeal, the real issue this Court should be concerned with is the fatally flawed process that resulted in Mr. Hall's conviction in the first place."

The declarations and the letter were part of the record before the state appellate courts. The California Court of Appeal held that the declarations were "plainly inadmissible" under state law, rejecting Hall's argument that portions of the declaration were in fact admissible because they recounted statements made during deliberations and did not simply describe the jury's reasoning.[3] The court cited the language in the declarations providing that the "jury verbally discussed and agreed," in finding that the declarations were inadmissible because they "purport[ed] to explain how the jurors allegedly understood the relevant instructions and arrived at their verdicts."

## ISSUES

In his petition, Hall raises two issues. First, he argues that his due process rights were violated when the trial court failed to instruct the jury that it was required to find that the victim did not consent to the touching. Second, Hall also contends that his due process rights were violated because the trial court failed to instruct the jury that it was required to find that he specifically intended to touch the victim against her will and without her consent.

---

[3]The state appellate court did not explicitly address Pellervo's letter, but presumably its reasoning as to the declarations applied as well to the letter.

United States District Court

For the Northern District of California

1    Previously, on appeal before the state appellate courts, Hall raised both of the above

2    issues in addition to other issues, including a claim that the trial court erred in failing to

3    instruct on the "reasonable belief in consent" defense and to give a *Mayberry* instruction.[4]

4    However, Hall concedes that he is not raising that issue as a stand-alone claim in his

5    federal petition, apparently anticipating an argument that it is not cognizable because it

6    arose solely under California law.  He does argue, though, that the trial court's failure to

7    instruct on the "reasonable belief in consent" defense and to give a *Mayberry* instruction is

8    relevant to any harmless error analysis with respect to the two other instructional issues

9    that he does raise in his petition.

10                                    **STANDARD OF REVIEW**

11    This court may entertain a petition for writ of habeas corpus "on behalf of a person

12    in custody pursuant to the judgment of a state court only on the ground that he is in custody

13    in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

14    2254(a).  Because the petition in this case was filed after the effective date of the

15    Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that act

16    apply here.  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district

17    court may not grant a petition challenging a state conviction or sentence on the basis of a

18    claim that was reviewed on the merits in state court unless the state court's adjudication of

19    the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

20    application of, clearly established Federal law, as determined by the Supreme Court of the

21    United States; or (2) resulted in a decision that was based on an unreasonable

22    determination of the facts in light of the evidence presented in the State court proceeding."

23    28 U.S.C. § 2254 (d).

24    A state court decision is "contrary to" Supreme Court authority, falling within the first

25    clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

26    _____

27        [4]This apparently includes the argument that CALCRIM No. 890 failed to inform the
       jurors that even if the victim did not consent, Hall could not be convicted if there was
28     reasonable doubt as to whether he reasonably but mistakenly believed she had consented.

United States District Court

For the Northern District of California

1  reached by [the Supreme] Court on a question of law or if the state court decided a case

2  differently than [the Supreme] Court has on a set of materially indistinguishable facts."

3  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  "Clearly established federal law" under §

4  2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

5  the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72

6  (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of

7  [Supreme] Court decisions as of the time of the relevant state court decision."  *Id.*

8          "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court

9  may grant the writ if the state court identifies the correct governing legal principle from [the

10  Supreme] Court's decisions but unreasonably applies that principle to the facts of the

11  prisoner's case."  *Id.* at 74.  However, this standard "requires the state court decision to be

12  more than incorrect or erroneous."  *Id.*  For the federal court to grant habeas relief, the

13  state court's application of the Supreme Court authority must be "objectively unreasonable."

14  *Id.* at 74-75.  The "objectively unreasonable" standard is different from the "clear error"

15  standard in that "the gloss of clear error fails to give proper deference to state courts by

16  conflating error (even clear error) with unreasonableness."  *Id.* at 75; *see also Clark v.

17  Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas

18  court, in its independent review of the legal question, is left with a firm conviction that the

19  state court was erroneous . . . Rather, the habeas court must conclude that the state

20  court's application of federal law was objectively unreasonable."  *Andrade*, 538 U.S. at 75;

21  *see also Clark*, 331 F.3d at 1068.

22          As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

23  habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

24  state court resulted in a decision that was based on an unreasonable determination of the

25  facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

26  2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

27  determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

28

United States District Court

For the Northern District of California

1   determining the "unreasonable determination of facts in light of the evidence" under §

2   2254(d)(2).  *See Torres v . Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000).  To grant

3   relief under 2254(d)(2), a federal court must be "left with a firm conviction that the

4   determination made by the state court was wrong and that the one [petitioner] urges was

5   correct."  *Id.* at 1108.

6          However, when the state court decision does not articulate the rationale for its

7   determination or does not analyze the claim under *federal* constitutional law, a review of

8   that court's application of clearly established federal law is not possible.  *See Delgado v.*

9   *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *see also* 2 J. Liebman & R. Hertz, Federal

10  Habeas Corpus Practice and Procedure § 32.2, at 1424-1426 & nn. 7-10 (4th ed. 2001).

11  When confronted with such a decision, a federal court must conduct an independent review

12  of the record and the relevant federal law to determine whether the state court's decision

13  was "contrary to, or involved an unreasonable application of, "clearly established federal

14  law."  *Delgado*, 223 F.3d at 982.

15         When a state court does not furnish a basis for its reasoning, we have no
           basis other than the record for knowing whether the state court correctly
16         identified the governing legal principle or was extending the principle into a
           new context. . . .[A]lthough we cannot undertake our review by analyzing the
17         basis for the state court's decision, we can view it through the 'objectively
           reasonable' lens ground by *Williams* [, 529 U.S. 362]. . . . Federal habeas
18         review is not de novo when the state court does not supply reasoning for its
           decision, but an independent review of the record is required to determine
19         whether the state court clearly erred in its application of controlling federal
           law. . . .  Only by that examination may we determine whether the state
20         court's decision was objectively reasonable.

21  *Id.*

                                    **DISCUSSION**

22

23  **A.   Admissibility/Consideration of Jurors' Declarations and Letter**

24         As noted, Hall submitted several declarations and a letter from jurors in conjunction

25  with his motion for a new trial and with his state court appeal suggesting that the jury was

    misled by the instructions.  Hall submitted the declarations and letter with his motion for
26
    release previously denied by this court, and the documents are also before this court as
27
    part of the record below.
28

                                            12

1    The parties have disputed the admissibility of the declarations and the letter. At the

2    outset, the court declines to resolve this issue – including whether it is required to consider

3    them for some purpose other than the merits – because, for the reasons set forth below,

4    the court need not consider the documents in order to conclude that Hall is entitled to

5    federal habeas relief.[5]

6    **B.    Analysis**

7        **1.    The Jury Instructions**

8    California Penal Code  § 220, which governs assault with intent to commit forcible

9    sexual penetration, provides in pertinent part:

10       (a) Except as provided in subdivision (b), any person who assaults another
         with intent to commit mayhem, rape, sodomy, oral copulation, or any violation
11       of Section 264.1, 288, or 289 shall be punished by imprisonment in the state
         prison for two, four, or six years.
12
         Section 289, which governs forcible acts of sexual penetration, in turn, provides:
13
         (a)(1) Any person who commits an act of sexual penetration when the act is
14       accomplished against the victim's will by means of force, violence, duress,
         menace, or fear of immediate and unlawful bodily injury on the victim or another
15       person shall be punished by imprisonment in the state prison for three, six, or eight
         years.
16
17   At trial, the jury was instructed with two form instructions, CALCRIM No. 1045,

18   governing forcible sexual penetration, and CALCRIM No. 890, governing assault with intent

19   to commit certain crimes. CALCRIM No. 1045 was given first, and CALCRIM No. 890

     followed.
20
21   The trial court gave CALCRIM No. 1045 as follows:

22       Damien Hall is charged in Count 1 with sexual penetration by force. To
         prove that the defendant is guilty of this crime, the People must prove that (1)
23       the defendant committed an act of sexual penetration with another person; (2)
         the penetration was accomplished by using a foreign object; (3) *the other*
24       *person did not consent to the act;* and (4*) the defendant accomplished the act*
         *by force*, violence, duress, menace, or fear of immediate and unlawful bodily
25
26       ---
         [5]In his traverse, Hall argues that even if the declarations are not admissible on the
27   merits, that to the extent the court concludes he has procedurally defaulted any of his claims,
     the court is required to consider the declarations as they pertain to his claim of actual
     innocence. *See House v. Bell*, 547 U.S. 518 (2006).
28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    injury to anyone.

2        Sexual penetration means penetration, however slight, of the genital
opening of the other person for the purpose of sexual abuse, arousal, or
3    gratification. A foreign object, substance, instrument, or device includes any
part of the body except a sexual organ. Penetration for sexual abuse means
4    penetration for the purpose of causing pain, injury, or discomfort.

5        *In order to consent, a person must act freely and voluntarily and know
the nature of the act.* Evidence that the other person requested, suggested,
6    communicated that the defendant use a condom or other birth-control device
is not enough by itself to constitute consent.

7
        *An act is accomplished by force if a person uses enough physical force
8    to overcome the other person's will.* Duress means a direct or implied threat
of force, violence, danger, hardship, or retribution that is enough to cause a
9    reasonable person of ordinary sensitivity to do or submit to something that he
or she would not otherwise do or submit to. When deciding whether the act
10   was accomplished by duress, consider all the circumstances, including the
age of the other person and her relationship to the defendant.

11
        Menace means a threat, statement, or act showing an intent to injure
12   someone. An act is accomplished by fear if the other person is actually and
reasonably afraid or if she's actually and unreasonably afraid and the
13   defendant knows of her fear and takes advantage of it. The defendant is not
guilty of forcible sexual presentation [ sic ] if he actually and reasonably
14   believed that the other person consented to the act.

15       *The People have the burden of proving beyond a reasonable doubt
that the defendant did not actually and reasonably believe that the other
16   person consented. If the People have not met this burden, you must find the
defendant not guilty.*

17
*People v. Dillon*, 174 Cal.App.4th 1367, 1376-77 (Cal. Ct. App. 2009) (emphasis added).
18
     It then instructed the jury as follows according to CALCRIM No. 890:
19
20       Damien Hall is charged in Count 1 with sexual penetration by a foreign
object through force or violence. A lesser-included offense of sexual
     penetration by a foreign object is assault with intent to commit the penetration
21   of the genital opening of another by a foreign object.

22       To prove the defendant is guilty of this crime, the People must prove
that (1) the defendant did an act that, by its nature, would directly and
23   probably result in the application of force to a person; (2) the defendant did
that act willfully; (3) when the defendant acted, he was aware of facts that
24   would lead a reasonable person to realize that his act, by its nature, would
directly and probably result in the application of force to someone; (4) when
25   the defendant acted, he had the present ability to apply force to a person; and
(5) when the defendant acted, he intended to commit the penetration of the
26   genital opening of another by a foreign object.

27       Someone commits an act willfully when he or she does it willingly or on
purpose. The terms application of force and apply force mean to touch in a
28

                              14

United States District Court
For the Northern District of California

1 harmful or offensive manner. The slightest touching can be enough if it is
2 done in a rude or angry way. Making contact with another person, including
through his or her clothing, is enough. The touching does not have to cause
3 pain or injury of any kind. The touching can be done indirectly or by causing
an object or someone else to touch the other person.

4 The People are not required to prove that the defendant actually
touched someone. No one needs to actually have been injured by the
5 defendant's act. But if someone was injured, you may consider that fact along
with all the other evidence in deciding whether the defendant committed an
6 assault and, if so, what kind of assault it was.

7 *To decide whether the defendant intended to commit the penetration of
the genital opening of another by force, please refer to the instruction which
8 defines that crime, which is the instruction labeled CALCRIM 1045.*

9 *Id.* at 458-59 (emphasis added).

10 In addition, the trial court instructed the jury with CALCRIM 252, which distinguishes

11 between those crimes that require proof of general intent and those that require proof of

12 specific intent.  The court instructed the jury about several crimes that require general

13 criminal intent, and then instructed the jury regarding specific intent crimes as follows:

14 The following crimes require a specific intent or mental state: Sexual
penetration by a foreign object with force or violence in Count 1, Penal Code
15 289(a)(1); sexual battery in Count 2, Penal Code 243.4; and robbery in Count
3, Penal Code 212.5(c).  To be guilty of these offenses, a person must not
16 only intentionally commit the prohibited act, but must do so with a specific
intent or mental state. The act or the intent or mental state required are
17 explained in the instruction for each crime.

18 Exh. B-15 at 74.

19 All of the above instructions given by the trial court were taken from the form

20 CALCRIM instructions.  At the time of Hall's trial, the CALCRIM instructions had been in

21 effect for less than a year, having replaced California Jury Instructions ("CALJIC") on

22 January 1, 2006.  As the state court noted, CALCRIM 890 operates in the same manner as

23 its predecessor, CALJIC 9.09.  *Id.* at 1379 n. 5.  CALCRIM 890, like CALJIC 9.09, is a fairly

24 general instruction, and does not exclusively govern assault with intent to commit *forcible*

25 *sexual penetration*.  Instead, like California Penal Code § 220, CALCRIM 890 governs

26 "assault with intent to commit specified crimes," and then includes blanks by which the

27 court may insert the particular underlying crime at issue in the case.  In other words,

28

1   CALCRIM 890 operates in conjunction with another jury instruction pertaining to the

2   underlying crime, in this case, CALCRIM 1045.

3          The Judicial Council bench use notes to CALCRIM 890 provide:

4          The court has a sua sponte duty to instruct on the sex offense or offense
           alleged. In the blanks, specify the sex offense or offenses that the defendant

5          is charged with intending to commit. Included sex offenses are: rape (Pen.
           Code, § 261); oral copulation (Pen. Code, § 288a [including in-concert

6          offense]); sodomy (Pen. Code, § 286 [including in-concert offense]); sexual
           penetration (Pen. Code, § 289); rape, spousal rape, or sexual penetration in

7          concert (Pen. Code, § 264.1); and lewd or lascivious acts (Pen. Code, § 288).
           (See Pen. Code, § 220.) Give the appropriate instructions on the offense or

8          offenses alleged.

9          Here, the trial court did just that, and instructed the jury pursuant to CALCRIM 1045.

10         **2.     Hall's Claims**

11         Hall does not dispute that CALCRIM 890 and 1045 were given in a manner that

12  complied with and tracked the form instructions.  Instead, he asserts that in a case such as

13  this one, involving assault with intent to commit forcible sexual penetration, the form

14  instructions, CALCRIM 890 and CALCRIM 1045, operate in a manner that is

15  unconstitutional because they do not provide the jury with the requisite elements of the

16  offense.  Hall asserts that unlike other CALJIC jury instructions that were improved with the

17  enactment of the CALCRIM instructions in 2006, the CALCRIM committee "blundered" with

18  CALCRIM 890.[6]

19         In both claims before this court, Hall challenges CALCRIM 890 generally, and in

20  particular, its reliance on and cross-reference to CALCRIM 1045.  Hall contends that

21  CALCRIM 890 should include the elements of the underlying crime - rather than just simply

22  cross-reference CALCRIM 1045.  Specifically, he asserts that "the reliance of CALCRIM

23  890 on a cross-reference to the form instruction on the greater offense of forcible digital

24  _____

25         [6]Two amici curiae letter briefs filed in support of Hall's petition for review before the
    California Supreme Court are part of the record before this court.  *See* Exhs. C-13; C-14.  One

26  of the briefs is from an attorney who served as a member of the CALCRIM committee, and
    urges the state supreme court to accept review in order to determine whether CALCRIM 890

27  "meets the standards of clarity and accuracy expected of CALCRIM instructions in general."
    Exh. C-13.

28

United States District Court

For the Northern District of California

1   penetration (CALCRIM 1045) resulted in the omission from the sexual-assault instructions

2   of any mention of two required elements:  the absence of consent on the part of the

3   complaining witness; and the defendant's specific intent to act against her will and without

4   her consent."

5               **a.      Lack of Complaining Witness' Consent**

6                    **i.      Procedural Default**

7        In its order denying Hall's motion for release, this court noted that Hall may have

8   procedurally defaulted one or both of his claims.  Having reviewed the parties' subsequent

9   filings, including the state's opposition and Hall's traverse, it is clear that only one of Hall's

10  two claims is affected by the potential procedural default - Hall's claim regarding the jury

11  instructions' failure to include the element of lack of consent.  The other issue regarding

12  Hall's intent is not impacted.

13       The California Court of Appeal found that Hall failed to preserve for appeal his

14  contention that CALCRIM No. 890 should have been modified to state that the prosecution

15  had the burden to prove the complainant's lack of consent.  The state appellate court noted

16  that at trial, Hall's counsel requested only an instruction that the prosecution was required

17  to prove beyond a reasonable doubt that he did not actually and reasonably believe the

18  complainant consented, and that there was no evidence that Hall requested a lack of

19  consent instruction at an unreported conference.  *Id.* at 1380 & n. 7.  It further noted that in

20  the event Hall indeed contended that he requested such an instruction before the trial court

21  he "failed to meet his burden of establishing that in the record."  *Id.*  The state court

22  nevertheless addressed the issue on the merits.

23       The state argues that Hall's failure to make and/or present on review before the

24  state court of appeal an adequate record in support of this claim rendered the issue non-

25  cognizable in state court, and that this state procedural default constitutes an adequate and

26  independent ground to bar his claim in this court as well.  It notes that California's

27  contemporaneous objection requirement is well-established, and that federal courts have

28

17

United States District Court

For the Northern District of California

1    repeatedly held that this state rule constitutes a valid procedural default.  The state argues

2    that the fact that the state court alternatively considered the merits of the claim has no

3    bearing on whether the claim was procedurally defaulted, noting that a state court's clear

4    and unequivocal invocation of a state procedural bar will not be disregarded even if the

5    state court alternatively considers the merits of the federal question as well.

6         In his traverse, Hall contends that the state court's ruling regarding his failure to

7    preserve the issue for appeal was erroneous.  He cites to state law and argues that a state

8    court's failure to instruct on a required element is cognizable on appeal even absent a

9    defendant's request that the court instruct on the element or an objection by the defense to

10   the instruction that is given.[7]  Hall further argues that even if he procedurally defaulted

11   either of his claims, the court should forgive the default because he is actually innocent.

12        While it appears to the court that the state's argument that Hall procedurally

13   defaulted this claim is strong, the court need not resolve the default issue because it

14   concludes that on the merits, Hall is not entitled to relief on this claim.  It is therefore also

15   unnecessary for the court to reach Hall's argument that he is actually innocent.

16                            **ii.    Merits**

17        Hall asserts in his opening brief that there is no dispute that the victim's lack of

18   consent is an essential element of the offense.  He contends that the trial court's

19   instructions omitted this element, and that rather than "recognize and correct" the

20   deficiencies of the form instructions, the state appellate court simply declared that Hall's

21   jury would have read into the instructions language they did not contain, and also would

22   have ignored specific language that the instructions did contain.

23        In its decision, the state appellate court did not explicitly state that lack of consent is

24   an element of the crime, but implied as much by holding that "CALCRIM Nos. 890 and

25   _____

26        [7]Hall argues that under state law, trial courts have a sua sponte duty to instruct on all
     elements of a charged crime.  He contends that under California Penal Code § 1259, an
27   appellate court may review any instruction given even if there was no objection below "if
     substantial rights of the defendant were affected."  He further asserts that the state court case
28   relied on by the appellate court for its default ruling is inapplicable.

United States District Court

For the Northern District of California

1045, taken together, adequately instructed the jurors that they had to find a lack of

consent before they could convict Hall for assault with intent to penetrate the genital

opening of another by a foreign object."[8]   174 Cal.App.4th at 1380.  In so holding, it

reasoned that in

> [r]eading CALCRIM No. 1045 to determine the intent required under
> CALCRIM No. 890, jurors would reasonably conclude that if the prosecution
> failed to prove the complainant's lack of consent the defendant could not be
> guilty of assault with intent to commit forcible sexual penetration.

*Id.*  In support, it cited language in CALCRIM No. 1045 providing that "[t]he People have the

burden of proving beyond a reasonable doubt that the defendant did not actually and

reasonably believe that the other person consented."

Hall challenges the state court's decision, arguing that its conclusion that the jury

would have determined the *victim's* state of mind in the course of determining the

*defendant's* was objectively unreasonable.  He further contends that CALCRIM 890

referred jurors to CALCRIM 1045 for the sole purpose of determining his requisite intent -

and *not* for determining other elements - such as the victim's lack of consent.  *See*

CALCRIM 890 ("[t]o decide whether the defendant *intended* to commit the penetration of

the genital opening of another by force, please refer to the instruction which defines that

crime, which is the instruction labeled CALCRIM 1045") (emphasis added).  He thus argues

that a reasonable juror would have no way of knowing that the alleged victim's lack of

consent was an independent element of sexual assault.

In opposition, and contrary to its position before the state court, the state argues for

the first time that it is actually *not* clear that lack of consent is even an element of the crime.

*See* Oppos. at 14-15.  However, assuming that lack of consent is an element of the crime,

the state asserts that CALCRIM 1045 in fact informed the jurors that one of the elements of

the crime was that the victim did not consent to the act of forcible sexual penetration.

In his traverse, Hall argues that the state's suggestion that lack of consent may not

---

[8]Both parties agreed in their briefs on appeal that lack of consent was an element of the offense.

**United States District Court**
For the Northern District of California

1    be an element of the offense is simply wrong under both California and federal law. [9]

2          At the outset, the court notes that both parties - and the state court - appear to

3    equate the statute's requirement that the act be "against the victim's will" with a lack of

4    consent, and have used the phrases interchangeably.  *See* Cal. Penal Code § 289(a)(1)

5    (requiring that the act be "accomplished against the victim's will").  Because this is an issue

6    of state law, and neither party nor the state court have suggested that there is any

7    distinction between "against the victim's will" and a lack of consent, and in fact have implied

8    that there is none, the court assumes this is a proper interpretation of California law for

9    purposes of federal habeas review.  The court notes that the commentary to CALCRIM

10   1045 states that "against the will" has been defined by California courts as "without

11   consent."  *See also People v. Key*, 153 Cal.App.3d 888, 895 (Cal. Ct. App. 1984); *People v.*

12   *Young*, 190 Cal.App.3d 248, 257 (Cal. Ct. App. 1987).

13         The state court's decision was not unreasonable because the jury was in fact

14   instructed on the lack of consent element. CALCRIM 1045 expressly provided that the

15   prosecution was required to prove that "the other person did not consent to the act."

16   Accordingly, because the lack of consent element was not omitted from the instructions, the

17   court reviews the instructions for ambiguity.  Even if there is some ambiguity, inconsistency,

18   or deficiency in the instruction, such an error does not necessarily constitute a due process

19   violation.  *Waddington v. Sarausad*, 129 S.Ct. 823, 831 (2009) (citing *Estelle v. McGuire*,

20   502 U.S. 62, 72 (1991)).  Rather, the petitioner must show both that the instruction was

21   ───────────────

22         [9]As noted, before this court, the state appears to challenge the state court's implicit
determination that lack of consent is an element of the crime of assault with intent to commit

23   forcible sexual penetration. This court does not review state court determinations of state law,
and even if it were to review the issue here, the court concludes that the state court's

24   determination that lack of consent is an element of the offense was not objectively
unreasonable. *See Ghent v. Woodford*, 279 F.3d 1121, 1134 n.12 (9th Cir. 2002) (noting that

25   the related crime of assault with intent to commit rape under California Penal Code § 220
"includes every fact necessary for a finding of rape except for the act of penetration"). The

26   state itself admitted as much in its brief before the appellate court. *See* Exh. C-5 at 78 ("One
of the elements of the crime of forcible sexual penetration, as told to the jury in CALCRIM No.

27   1045, is that the victim did not consent to the act of forcible sexual penetration."). The state's
latest change in position otherwise is not persuasive.

28

20

United States District Court

For the Northern District of California

1  ambiguous and that there was "a reasonable likelihood" that the jury applied the instruction

2  in a way that relieved the state of its burden of proving every element of the crime beyond a

3  reasonable doubt.  *Id.* (citing *Estelle*, 502 U.S. at 72).  In making this determination, the jury

4  instruction "may not be judged in artificial isolation, but must be considered in the context of

5  the instructions as a whole and the trial record."  *Id.* (quoting *Cupp v. Naughten*, 414 U.S.

6  141, 147 (1973)).  "The pertinent question is 'whether the ailing instruction by itself so

7  infected the entire trial that the resulting conviction violates due process.'"  *Id.* (quoting

8  *Cupp*, 414 U.S. at 147).     Therefore, in order to establish a due process violation, Hall is

9  still required to demonstrate a "reasonable likelihood" that the jury applied the instruction in

10 a way that relieved the state of proving every element of the crime beyond a reasonable

11 doubt.  *Waddington*, 129 S.Ct. at 831.  A "reasonable likelihood" is lower than the "more

12 likely than not" standard but higher than a mere "possibility."  *Polk v. Sandoval*, 503 F.3d

13 903, 910 (9th Cir. 2007).

14      A determination that there is a reasonable likelihood that the jury has applied the

15 challenged instruction in a way that violates the Constitution establishes only that an error

16 has occurred.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found,

17 the court also must determine that the error had a substantial and injurious effect or

18 influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637

19 (1993), before granting relief in habeas proceedings.  *See Calderon*, 525 U.S. at 146-47.

20      Considering the instructions as a whole, the court cannot say that there was a

21 reasonable likelihood that the jury applied the challenged instructions in a way that violates

22 the Constitution.  Although CALCRIM 890 did refer the jury to CALCRIM 1045 for purposes

23 of determining the defendant's "intent to commit the penetration of the genital opening of

24 another by force," the jury would have reviewed CALCRIM 1045 as a whole, and that

25 instruction, in several places, informs the jury that the prosecution was required to prove

26 the victim's lack of consent.  *See Estelle*, 502 U.S. at 72 n.4.  For this reason, the state

27 appellate court's determination on this claim was not contrary to, or an unreasonable

28

21

United States District Court
For the Northern District of California

1   application of, clearly established federal law.  Because the court concludes that there was

2   no constitutional error regarding the lack of consent element, the court need not address

3   whether such error was harmless.

**b.    Defendant's Specific Intent**

5   Hall also argues that CALCRIM Nos. 890 and 1045 omitted the specific intent

6   element in violation of his due process rights.  He notes that CALCRIM 890 referred the

7   jury to CALCRIM 1045 to ascertain intent, but that CALCRIM 1045 defined the crime of

8   sexual penetration, a *general* intent crime.  Hall asserts that, unlike sexual penetration,

9   assault with intent to commit sexual penetration is a *specific* intent crime which required

10  that he intended to commit sexual penetration without the victim's consent.[10]  *See People v.*

11  *Senior*, 3 Cal.App.4th 765, 776 (Cal. Ct. App. 1992).  Hall therefore contends that neither

12  CALCRIM 890 nor CALCRIM 1045 - nor the two instructions in combination - accurately

13  stated the intent required.

14  The state appellate court agreed with Hall that in order to be convicted under

15  California Penal Code § 220 of assault with intent to commit forcible sexual penetration,

16  specific intent to commit the act without the consent of the victim was required – not just

17  intent to commit the underlying sexual act.  *Dillon*, 174 Cal.App.4th at 1378 (citing *People v.*

18  *Davis*, 10 Cal.4th 463, 509 (Cal. 1995)).  It further held that because of this, the mental

19  state required for conviction of assault with intent to commit forcible sexual penetration "is

20  not the same" as that required for forcible sexual penetration, a general intent crime.  *Id.* at

21  1380.  Nevertheless, without much explanation, the state appellate court implied that the

22  instructions' failure to specify the specific intent required for assault with intent to commit

23  forcible sexual penetration was not error.  In support, it noted that the former comparable

24  CALJIC instructions operated in "exactly the same fashion," and did "not mention any

25  specific intent to act against the complainant's will."  174 Cal.App.4th at 1379 n.5.

26

27  [10]Again, as was the case with the consent issue, the parties use the phrases "without
28  consent" and "against her will" interchangeably.

22

United States District Court
For the Northern District of California

1   The state court also held that the failure of CALCRIM 252 to include assault with

2   intent to commit forcible sexual penetration among the listed specific intent crimes "in no

3   way entitle[d] or induce[d] jurors to assume that no specific intent was required to convict

4   [Hall]." *Id.* at 1379. The court noted that CALCRIM 252 described specific and general

5   intent with respect to only the charged crimes, and "did not purport to discuss or classify the

6   intent required for any of the lesser-included offenses." *Id.* Ultimately, the state appellate

7   court concluded that because CALCRIM 1045 advised jurors that they were required to find

8   a lack of consent, the jurors must also have ascertained that they were required to find that

9   Hall assaulted the victim with the intent to sexually penetrate her without her consent. *Id.* at

10  1380.

11      Hall argues that it was objectively unreasonable for the state court to find that a

12  reasonable juror, not properly instructed regarding the specific intent but instead instructed

13  that s/he was required to find general intent, would have somehow figured out the requisite

14  intent. Moreover, Hall reiterates that CALCRIM 252, which listed the specific intent

15  offenses, notably did not include California Penal Code § 220, assault with intent to commit

16  sexual penetration.

17      In opposition, the state argues that the state court's decision was reasonable

18  because the jury instructions were adequate regarding Hall's intent, and that it wasn't

19  necessary that the jury be told that the intent required was a "specific" intent. The state

20  contends that CALCRIM 890 required the jury to find that Hall "intended to commit" the

21  "crime" defined by CALCRIM 1045. It argues that because CALCRIM 1045 included the

22  elements of sexual penetration, CALCRIM 890 and CALCRIM 1045 in combination

23  therefore required that Hall intend to commit each of the elements, including the element

24  that "the other person did not consent to the act." In other words, according to the state,

25  CALCRIM 890 informed the jurors that in order to find Hall guilty of the crime, it was

26  required to find that he intended to commit the crime defined by CALCRIM 1045, which

27  necessarily included that he intended that the act of forcible sexual penetration be against

28

United States District Court
For the Northern District of California

1  the victim's will.  It argues that there is thus no "reasonable likelihood" that the jury applied

2  the instructions in the manner that Hall contends it did.

3  In his traverse, Hall contends that the "reasonable likelihood" standard utilized by the

4  state is the wrong test here since the jury instructions were not simply ambiguous, but in

5  fact omitted an element of the offense.  He asserts that because the omission of an

6  element of the offense itself constitutes constitutional error, the issue here is whether that

7  error is harmless or prejudicial.

8  The court agrees with Hall that this issue is not simply one of an ambiguous jury

9  instruction.  Instead, unlike the lack of consent element discussed above, neither CALCRIM

10  890 nor 1045 included the element of intent required for conviction of the lesser-included

11  offense, assault with the intent to commit forcible sexual penetration without the victim's

12  consent.  Therefore, the instructions were erroneous on these facts, and the "reasonable

13  likelihood" standard employed for ambiguous jury instructions is not applicable.  *Ho v.

14  Carey*, 332 F.3d 587, 592 (9th Cir. 2003).  If a jury instruction omits a necessary element of

15  the crime, constitutional error has occurred.  *Id.* at 593 (finding jury instructions "erroneous"

16  rather than ambiguous, where they included an uncorrected erroneous instruction that

17  second-degree murder could be based on a finding of general intent, but also included an

18  accurate description of the elements of second-degree murder, including specific intent);

19  *see also Polk,* 503 F.3d at 910.

20  However, actual prejudice is still required before relief may be granted.  *See Ho*, 332

21  F.3d at 595 (citing *Brecht*, 507 U.S. at 637); *see also Hedgpeth v. Pulido*, 129 S.Ct. 530,

22  532 (2008) (confirming that instructional error is subject to a harmless error analysis); *Byrd

23  v. Lewis*, 566 F.3d 855, 866 (9th Cir. 2009).  The omission will be found harmless unless it

24  "'had substantial and injurious effect or influence in determining the jury's verdict.'"

25  *California v. Roy*, 519 U.S. 2, 4 (1996) (quoting *Brecht*, 507 U.S. at 637).  Where the trial

26  court fails to alert the jurors that they must consider an element of the crime, the omission

27  is harmless if review of the facts found by the jury establishes beyond a reasonable doubt

28

24

United States District Court

For the Northern District of California

1   that the jury necessarily found the omitted element.  *See United States v. Lin*, 139 F.3d

2   1303, 1309 (9th Cir. 1998) (error harmless if no rational jury would have made the findings

3   without also finding missing element of the crime).  But if the reviewing federal habeas

4   court is in grave doubt as to whether the error had substantial and injurious effect or

5   influence in determining the jury's verdict, the petitioner is entitled to the writ.  *See*

6   *Evanchyk v. Stewart*, 340 F.3d 933, 940-42 (9th Cir. 2003); *Ho*, 332 F.3d at 595-96.

7       The California Court of Appeal did not address whether any error was harmless or

8   prejudicial because it found no error.

9       Hall argues that the constitutional error was not harmless because the evidence

10  against him was not overwhelming and because Hall's understanding regarding

11  Antoinette's consent was a critical factual issue that was contested at trial.  Hall

12  emphasizes that since it was undisputed at trial that he put his hands down Antoinette's

13  pants, the pivotal issues at trial concerned his mental state and her consent.  Hall also

14  argues that his acquittal on both the forcible digital penetration and the sexual battery

15  charges demonstrates that the jurors would have acquitted him on the assault with intent to

16  commit digital penetration because the jury was explicitly instructed that Antoinette's lack of

17  consent and the absence of Hall's reasonable belief in consent had to be proven for

18  conviction on the former charges.

19      In opposition, the state argues that any error was harmless because the evidence

20  overwhelmingly demonstrated that Hall put his hand down Antoinette's pants with the intent

21  to penetrate her against her will and without her consent.  In support, the state points to

22  Hall's admission that he did not ask Antoinette for permission put his hand in her pants.  It

23  also argues that Antoinette's testimony was more credible than Hall's because Hall was a

24  stranger, and Antoinette had no reason to falsely accuse him.  Furthermore, the state notes

25  Hall's admission that he intended to penetrate her vagina "if it ever got that far."  The state

26  contends that based on the "undisputed" facts alone, any reasonable juror would have

27  concluded beyond a reasonable doubt that Hall intended to touch Antionette without her

28

United States District Court

For the Northern District of California

1   consent.  The state also argues that Hall's trial counsel's closing argument cured any

2   prejudice because he made the requisite intent clear, as did the prosecution's rebuttal.  9

3   R.T at 80-91.

4        In his traverse, Hall counters that counsel's arguments regarding the elements of the

5   crime cannot render the error harmless as the state suggests.  *Ho*, 332 F.3d at 595.

6   Nevertheless, he contends that the closing arguments did not include clear directions

7   regarding the requisite elements.

8        The court need not consider the contested juror declarations to conclude that it is in

9   "grave doubt" as to whether the jury necessarily found that Hall assaulted Antoinette with

10  the intent to sexually penetrate her *against her will*.  *Evanchyk*, 340 F.3d at 940-42.  Having

11  reviewed the record, including the testimony and the parties' closing arguments, it is clear

12  that Hall's intent at the time he touched Antoinette was hotly disputed.  There is nothing in

13  the record that indicates that the jury - in the absence of an instruction otherwise - would

14  have "necessarily" found that Hall specifically intended to touch Antoinette without her

15  consent.  *See Lin*, 139 F.3d at 1309.  Nor is it possible, as the state implicitly requests, for

16  this court to make a determination based on the record before it that the jury "necessarily"

17  found Antoinette's testimony on the issue more credible than Hall's, particularly in view of

18  his acquittal of attempted sexual penetration.

19       Accordingly, because this court has serious doubts as to whether the error had a

20  substantial and injurious effect or influence in determining the jury's verdict, it concludes

21  that the state appellate court's decision involved an unreasonable application of, clearly

22  established federal law, and grants habeas relief based on the challenged jury instruction.

23  *See Brecht*, 507 U.S. at 637.

## CONCLUSION

24

25       For the above reasons, the court GRANTS habeas relief on Hall's claim that his due

26  process rights were violated by the trial court's failure to instruct on the specific intent

27  required for conviction of assault with intent to commit forcible sexual penetration.

28       Accordingly, Hall's conviction is VACATED.  The respondent shall release petitioner

from custody unless the state commences proceedings to retry petitioner within 90 days of the date of entry of judgment on this order.

The clerk shall send an informational copy of this order to the district attorney of San Francisco County, in addition to the usual service on counsel of record.

**IT IS SO ORDERED.**

Dated:   July 29, 2010

_____
PHYLLIS J. HAMILTON
United States District Judge

**United States District Court**
For the Northern District of California